**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK**

```
 _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _
|                                 |
|                                 |
| Zaher Zahrey,                   |
|                                 |
|                Plaintiff,       |
|                                 |
|                                 |     Civil Action No. 98-4546
|         -v.-                    |     (DCP)(JCF)
|                                 |
| City of New York, et al.,       |
|                                 |
|                Defendants.      |
|                                 |
|                                 |
|                                 |
|                                 |
 L_ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _|
```

[Plaintiff's motion to strike denied.  Defendants' motion for
summary judgment granted in part and denied in part.]

                                   Dated: January 7, 2009

Joel B. Rudin for Plaintiff.

Michael Cardozo, Marilyn Richter, Corporation Counsel of the City
of New York, for Defendants.

### OPINION

    POGUE, Judge:[1] Plaintiff Zaher Zahrey ("Zahrey"), a former New
York City Police Department ("NYPD") detective, was indicted,
tried, and acquitted of various crimes, including robbery,
attempted robbery, conspiracy, narcotics and firearms trafficking,
and misprison.  In this action, Zahrey now sues NYPD, Kings County

_____

    [1] Judge Donald C. Pogue of the United States Court of International
Trade, sitting by designation.

District Attorney's Office ("KCDAO") employees, city officials, the City of New York, and Kings County, under 42 U.S.C. §§ 1981, 1983, and 1985, and asserts pendent state claims of malicious prosecution and negligent hiring and training. The gravamen of Zahrey's claims is that New York police officers knowingly encouraged false testimony against Zahrey by a corrupt and unreliable witness and presented this evidence to prosecutors, while suppressing exculpatory evidence.

Defendants include NYPD and KCDAO employees Robert Boyce, Kelly Wirth, Michael McWilliams, Michael Welsome, Theresa Corrigan, Charles Guria, Dennis Hawkins, Douglas Little, and Joseph Ponzi, in both their individual and official capacities (collectively, "Individual Defendants"); NYPD Commissioner Howard Safir and Kings County District Attorney Charles Hynes, solely in their official capacities (collectively, "Official Defendants"); and the City of New York and Kings County (collectively, "Municipal Defendants").

After discovery, Individual Defendants move for summary judgment and Municipal and Official Defendants move for partial summary judgment, claiming that Zahrey has failed to identify evidence that can reasonably be interpreted to support his claims.

As explained below, the court DENIES Defendants' motions in part and GRANTS their motions in part.

**APPLICABLE STANDARD**

A party is entitled to summary judgment if it can demonstrate

2

"that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). On a motion for summary judgment, the court must consider "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 251-52 (1986). Once the movant has "'show[n]'" or "point[ed] out. . . that there is an absence of evidence to support the nonmovant['s] case," the burden shifts to the nonmovant. Celotex Corp. v. Catrett, 477 U.S. 317, 325-27 (1986). To discharge his burden, "a plaintiff must come forward with evidence to allow a reasonable jury to find in his favor" on each of the elements of his prima facie case. Lizardo v. Denny's, Inc., 270 F.3d 94, 101 (2d Cir. 2001).

The court must draw all factual inferences in favor of the party against whom summary judgment is sought and view the factual assertions in materials such as affidavits, exhibits, and depositions in the light most favorable to the nonmovant. Anderson, 477 U.S. at 255; Celotex Corp., 477 U.S. at 322. However, a nonmovant benefits from such factual inferences "only if there is a 'genuine' dispute as to those facts." Scott v. Harris, 127 S. Ct. 1769, 1776 (2007). The law is well established that "conclusory statements, conjecture, or speculation" are insufficient to defeat a motion for summary judgment. Kulak v. City of New York, 88 F.3d

3

63, 71 (2d Cir. 1996). The nonmovant cannot survive summary judgment simply by proffering "some metaphysical doubt as to the material facts," Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986), or presenting evidence that "is merely colorable, or is not significantly probative." Savino v. City of New York, 331 F.3d 63, 71 (2d Cir. 2003) (quoting Anderson, 477 U.S. at 249-50, (citation omitted)). Rather, he must "set out specific facts showing a genuine issue for trial." Fed. R. Civ. P. 56(e)(2) (emphasis added); see D'Amico v. City of New York, 132 F.3d 145, 149 (2d Cir. 1998) ("the non-moving party may not rely on mere conclusory allegations nor speculation, but instead must offer some hard evidence showing that its version of the events is not wholly fanciful.").

## BACKGROUND

As Defendants are moving for summary judgment, the court accepts as true, for the purposes of these motions, certain facts identified in the Plaintiff's affidavits, briefs, and motions. Based on these filings, the Court will first summarize the circumstances and incidents related to the pending motions. The court will then address Zahrey's motion to strike part of the Defendants' summary judgment filing, before turning to the issues raised by Defendants' motions.

In 1985, Zahrey joined the NYPD, and in 1991 he became involved in undercover narcotics buy-and-bust operations. Zahrey

4

was promoted to detective in late 1992.

Growing up in Brooklyn, Zahrey befriended and played basketball with William "Supreme" Rivera, an alleged gang member involved in drugs, robbery, and murder. Following Supreme's March 10, 1994 murder, Zahrey took an interest in the NYPD investigation of Supreme's death. At the 68th Precinct, Zahrey learned from Internal Affairs Bureau ("IAB") Sergeant Robert Boyce that Supreme was killed with the handgun of off-duty police officer Jose Gutierrez. Officer Gutierrez alleged that Helder Pena grabbed the officer's gun out of its holster and fired at Supreme's car, at the same time that another criminal also fired. Because an officer was, directly or indirectly, involved in this shooting, IAB took over the investigation. Boyce expressed interest in Zahrey's assistance obtaining information and locating witnesses. Zahrey later met Boyce to identify potential witnesses to the murder, and reported that Officer Gutierrez, a friend of Pena, had been protecting a Brooklyn drug-selling location and that Gutierrez's father is a known drug-dealer. Pl.'s Exs. In Opp. To Def.'s Summ. J. Mot., Ex. D at ¶ 15 (hereinafter "Pl.'s Ex."). Zahrey also complained to Boyce that "a sergeant in the 72nd Precinct, whom [he] thought Boyce might know," as Boyce also worked at the 72nd Precinct, was "investigating and bad-mouthing [Zahrey] in an apparent effort to protect the Gutierrez family." Id. at ¶ 16. The officer referred to was Sergeant Whalen of the 72nd Precinct; at

the time, Sergeant Whalen was assigned to the Robbery Identification Unit and reported hearing arrestees mention a police officer, fitting Zahrey's description, who was involved with drug-dealers. Def.'s Exs. on Their Summ. J. Motion, Ex. 6 (hereinafter "Def.'s Ex.").[2]

## I. Investigation of Zahrey

In 1994, Boyce and Whalen interviewed Carlos Torres, who claimed that Zahrey sold guns and confidential information regarding drug-selling locations to gangs. Pl.'s Ex. I at 140-41, 166-67; Def.'s Ex. 6. Torres also reported a death threat against Sergeant Whalen allegedly originating from Zahrey. Pl.'s Ex. I at 135-36; Def.'s Ex. 6. Torres's credibility, however, is questionable. Torres appeared inebriated when meeting with the detectives -- Boyce testified to knowing that Torres had been drinking when Boyce interviewed him. Pl.'s Ex. H at 793-97; Pl.'s Ex. VV at 47-48. Furthermore, Torres was arrested in possession of a hand grenade at an NYPD officer's 1988 funeral. Pl.'s Ex. I at 151-52. According to Torres's daughter Becky, he is a delusional alcoholic who falsely represents himself as an agent of the FBI and CIA. Pl.'s Ex. H at 143-48. Nonetheless, Boyce opened an IAB investigation of Zahrey, and KCDAO Assistant District Attorney Charles Guria assisted.

---

[2] Boyce did not "make a log at IAB" in response to Zahrey's concerns, although a log would arguably have been an appropriate response. Pl.'s Ex. I at 227.

6

In December 1994, Sergeant Boyce interviewed Supreme's sister, Lisa Rivera, a repeating felony drug offender and heroin addict. Def.'s Ex. 6; Pl.'s Ex. L at 297. At the time, she was in jail for jumping bail on felony drug charges. Although she implicated her brother Supreme with regard to illegal drugs and a March 1992 robbery, Ms. Rivera claimed she had no knowledge that Zahrey was involved in criminal activity. Pl.'s Ex. I at 567; Def.'s Ex. 6. Meanwhile, Boyce noted a conversation with "Slick," another confidential informant, who told him a person named Angel knew "Zack [Zahery] from the block" and that "Zack is crooked" because he helps Supreme with drug rip-offs. See Def.'s Ex. 6.

IAB then turned to Sidney Quick, one of Supreme's alleged criminal associates.[3] Quick faced possible imprisonment of 25 years to life for various robberies in Brooklyn and Manhattan, and suffered an addiction to crack cocaine. Pl.'s Ex. R at 3-4. In August, Boyce visited Quick at Rikers Island and encouraged him to cooperate with the Zahrey investigation in exchange for leniency in Quick's criminal trial. During this and other interviews, Quick fingered Zahrey as a fellow member of Supreme's gang who provided guns and inside information for fourteen of the gang's drug rip-offs and took shares in approximately $200,000 of the proceeds. Pl.'s Ex. H at 827-30; Def.'s Ex. 6. Quick provided information on

---

[3] When interviewing witnesses like Quick and Lisa Rivera, IAB detectives took notes and drafted worksheets for use in the investigation and eventual prosecution.

7

specific criminal incidents:

- Homicide and Attempted Robbery and Kidnapping of Ismael Guadalupe on October 14, 1993: Originally, Quick denied knowing Guadalupe and said Supreme did not permit him to be involved in this incident because he was "too cracked out." Pl.'s Ex. H at 764-65; Def.'s Ex. 15 at 30. Quick later said that Supreme and Zahrey drove in from Staten Island and picked Quick up; they planned to kidnap Guadalupe, tie him up, and either hold him for ransom or threaten him in order to get the keys to Guadalupe's safe. Pl.'s Ex. C at 255-56. When Guadalupe ran from them, Quick claimed, Supreme shot him, and Zahery threw the gun in the East River from FDR Drive in Manhattan.[4] Def.'s Ex. 15 at 30-31. Quick was NYPD's prime suspect in this homicide.

- Robbery of Francisco and Migdalia Quinones on June 22, 1993: Quick stated that he, along with Supreme, Lenny Ingram, Eric Sandoval, and a man named "Hop," stole the Quinoneses' jewelry, cash, cocaine, and a cell phone, and that Zahrey provided back up in Hop's Porsche. Def.'s Ex. 6; Pl.'s Ex. C at 374. Quick said they used guns provided by Zahrey. Def.'s Ex. 6. At the same time, Quick told IAB that he was not released from prison until August of that year. Id.

---

[4] Later, Quick testified before the federal grand jury that Supreme in fact threw the gun. Pl.'s Ex. EE at 50.

8

- <u>"Pigeon Park" Robbery in 1992 or 1993</u>: Quick stated that he, Zahrey, Supreme, and two others tied up two males and robbed them of marijuana, cocaine, jewelry, and $4,000. Def.'s Ex. 6. Supreme might have shot another drug dealer. <u>See</u> Def.'s Ex. 15 at 103-04. The perpetrators met up afterwards at Gladys Moran's apartment, Def.'s Ex. 6; Pl.'s Ex. C at 670, but IAB never interviewed Ms. Moran. Pl.'s Ex. C at 669-72. Quick originally said he was in prison during this robbery but later said he was present at the robbery. <u>See</u> Def.'s Ex. 6; Def.'s Ex. 15 at 103-04. Police never corroborated the robbery or shooting. Pl.'s Ex. L at 3101.

- <u>Antoine Casada Robbery in Summer 1993</u>: Quick claimed that Zahery was present and that they used police equipment, detective shields, police raid jackets, and bulletproof vests to rob Antoine and another man. Def.'s Ex. 6. Quick stated he shot Antoine in the buttocks, <u>id.</u>, but Quick later said instead that he shot "the other boy" in the leg. Def.'s Ex. 15 at 86. Antoine denied that this incident took place, and IAB was unable to find any corroborating medical evidence. Pl.'s Ex. C at 318.

Quick made a taped telephone call to Zahrey, but Zahrey did not make any specifically incriminating statements. <u>See</u> Def.'s Ex. 10. Zahrey offered to give Quick "chump change," but never did so. <u>See</u> Def.'s Ex. 66 at 23-24.

9

Despite Quick's cooperation, he was sentenced to six years to life for the Manhattan robbery. After Quick was sentenced, Sergeants Boyce and McWilliams traveled to Sing Sing Prison in March 1995. Quick provided information on yet another criminal incident:

*   Armored Car Robbery on March 20, 1992: Quick said he heard about the robbery from Supreme, who allegedly told Quick that Zahrey helped and received proceeds. Def.'s Ex. 15 at 106-07; Def.'s Ex. 6. According to the police report, robbers stole $186,000 from a Vets International Armored Company car in Brooklyn. Def.'s Ex. 6. The robbers used sawed-off shotguns to kill one Vets employee and shoot another employee in the head and neck. Id.; Pl.'s Ex. XX at 5-17.

Quick also stated that he often took drugs with Zahrey. Def.'s Ex. 6.

The two detectives spoke with Quick for over two hours and taped the entire interview. During this interview, the detectives made various statements which we will discuss more thoroughly below; for example, they told Quick he could get a "very, very, very sweet deal" and they would "drive [him] home" if he gave them information on Zahrey. See Def.'s Ex. 15. The tape apparently was, for a period of time, missing, and was found later in Guria's office. Pl.'s Ex. C at 74.

10

Subsequently, Quick "passed" four polygraph tests.[5] See Pl.'s Exs. LL, MM, NN, OO. Nonetheless, the detectives could not find any information that corroborated Quick's statement that Zahrey took part in any criminal activities. Quick's credibility is also less than ideal; in addition to being a career felon, he has repeatedly lied to medical and law enforcement authorities. He often used his brother Rubin's name to fool police. See, e.g., Pl.'s Ex. EE. Quick later admitted to implicating Zahrey in robberies at that time because he hoped to get a lower sentence for his robbery charge. Quick's wife, Mercedes, wrote an affidavit that Quick confessed to her that he in fact shot Guadalupe and agreed to be a government witness only because he was facing life in prison. Pl.'s Ex. JJ at ¶¶ 4-5. In his deposition, Boyce admitted to questioning Quick's veracity. Pl.'s Ex. I at 620, 635, 643.

As a result of the investigation of Zahrey, on August 10, 1995, NYPD placed Zahrey on modified assignment. Pl.'s Ex. D at ¶¶ 20, 24. NYPD took Zahrey's weapon and shield and reassigned him, on full salary, to Manhattan Court Section. Id. According to Zahrey's affidavit, during a car ride to his brother-in-law's house to seize another weapon owned and registered by the brother-in-law, Boyce made what Zahrey considers a racial/ethnic slur: "I like to

---

[5] Zahrey disputes the results reached by Investigator Douglas Little and provides an expert affidavit challenging Little's inattention to faulty galvanic skin response readings. Pl.'s Ex. EE at 50.

11

smoke a Camel." Id. at ¶ 22.

Zahrey's work time records showed that he took vacation during the Quinones robbery and left work early on the day of the Guadalupe murder. Def.'s Ex. 6. The detectives looked into Zahrey's financials, finding substantial arrears in several mortgages, equity loans, credit card, and other debt. Id. Zahrey made a large payment of $12,000 to $15,000 on one of his mortgages shortly following the armored car heist, however Zahrey insists this payment resulted from federal tax refund receipts. See Pl.'s Ex. B at 798; Pl.'s Rule 56.1 Stmt. ¶ 342.

In December 1995, the detectives again interviewed Lisa Rivera who provided more details about the armored car robbery. Ms. Rivera indicated that her brother Supreme asked her to make a telephone call to divert the police, but she refused. Pl.'s Ex. O. After the robbery, Supreme's gang met at Lisa Rivera's house. Id. Supreme had a shoe box containing money-filled envelopes with names written on them; one of the envelopes was blank. Id. But Ms. Rivera still insisted that Zahrey was "straight." Pl.'s Ex. C at 497-98. IAB detectives interviewed Ms. Rivera's mother, Maria Montanez, although Ms. Rivera had to translate as Ms. Montanez spoke little English. Pl.'s Ex. C at 524. Ms. Montanez reported that her son Supreme, Ingram, Sandoval, Mercado, and Zahrey were in her apartment a day or so after the armored car robbery acting "very jubilant." Pl.'s Ex. O. According to Ms. Montanez, Zahrey

12

said "[t]hat is easy money, it beats working for a living." Id.

KCDAO determined it had probable cause to arrest, and NYPD arrested, Ingram, Sandoval, and Mercado for the armored car robbery. However, because of the requirements of New York state law regarding accomplice testimony without corroboration, which would severely limit the evidence admissible against Zahrey, KCDAO and IAB recommended that the United States Attorney's Office ("USAO") take the Zahrey case. USAO assigned Assistant U.S. Attorney Martin Coffey[6] to the case and KCDAO Assistant District Attorney Theresa Corrigan assisted him.

In July and September, Quick became reticent with regard to continued cooperation, and USAO refused to prosecute without his testimony. See Pl.'s Ex. C at 430-31. Federal and state government agencies then worked to have Quick and his mother Hannah relocated and Quick's sentence reduced. The authorities also monitored Quick's phone calls, audio-taping his discussions with Corrigan and his collect calls to his mother. Corrigan sent Quick spending money for the prison commissary around September 27. Pl.'s Ex. BBB at 59817. On September 30, Quick and his lawyer signed a federal cooperation agreement. See Pl.'s Ex. CCC. According to the agreement, Quick voluntarily plead guilty to robbery conspiracy and to firearms violations between 1992 and 1994. Id. Quick's

---

[6] Coffey was dismissed from the lawsuit following Zahrey's successful appeal to the Second Circuit on Coffey's affirmative defense of immunity. See Zahrey v. Coffey, 221 F.3d 342 (2d Cir. 2000).

13

punishment could be reduced from the mandatory five-year consecutive sentence, but this depended upon Government support, specifically the Government writing a 5K1 cooperation letter after Quick's participation in Zahrey's trial.[7] Id. IAB detectives also continued to question Lisa Rivera. Before the grand jury, Ms. Rivera testified that Supreme said the blank envelope containing money was intended for Zahrey. Pl.'s Ex. ZZ at 38.

## II. **Zahrey's Criminal Pre-trial and Trial**

A federal grand jury indicted Zahrey on October 15, 1996 for various crimes including joining a conspiracy to rob drug dealers; participating in the attempted robbery, attempted kidnapping, and the homicide of Guadalupe; participating in the robbery of Quinones; trafficking guns and narcotics; and misprison. See Def.'s Ex. 30. Zahrey was subsequently arrested at work and detained. Pl.'s Ex. C at 641-42, and NYPD suspended Zahrey from duty without pay. Pl.'s Ex. D at ¶ 27. On October 24, the court released Zahrey on \$500,000 bail. See Def.'s Ex. 33.

On October 29, Quick's mother Hannah alleged that she received a threatening phone call; the caller claimed he "kn[ew] about [her] and [her] grandchildren" and that they were "dead." Def.'s Ex. 36 at 7. Quick's mother first claimed that, although the caller did not identify himself, she recognized the voice as Zahrey's. Def.'s

---

[7] Following Zahrey's trial, and filing of Coffey's 5K1 letter, Quick was sentenced to three years imprisonment and three years supervised release, plus special assessments of \$50 on each count. Def.'s Ex. 63 at 7.

14

Ex. 35 at 10, 15. Zahrey argues that Quick's mother lied about the phone call in order to help obtain government relocation to another neighborhood in New York City. On October 31, Coffey requested that the court revoke Zahrey's bail. See Def.'s Ex. 35. At the bail revocation hearing, Quick's mother testified that the caller had indeed identified himself as "Zach Zach" or "Zach Zachery." Def.'s Ex. 36 at 7. In response, Zahrey presented the alibi testimony of his mother, next-door neighbor, and wife, as well as another defense attorney. Id. at 74-107. U.S. Magistrate Judge Azrack revoked Zahrey's bail and U.S. District Judge Gershon affirmed the order on November 7. The Second Circuit also affirmed on November 26. The motion to reconsider was denied and the denial was again affirmed by the Second Circuit. Judge Gershon also denied Zahrey's motion for pre-trial release. Zahrey was thus remanded to protective custody twenty-three hours a day. Pl.'s Ex. D at ¶ 35.

Zahrey's six week federal jury trial began May 6, 1997. On June 27, the jury acquitted Zahrey of all charges. NYPD assigned him to work, at full salary, on modified assignment at an automobile impound lot. Id. at ¶ 33.

### III. Zahrey's Departmental Trial

Pursuant to policy, NYPD issued disciplinary charges against Zahrey that mirrored his criminal indictment. Pl.'s Ex. O; Pl.'s Ex. F at 21-24. Departmental prosecutor Sergeant Dailey concluded

15

he had sufficient evidence regarding the Guadalupe homicide to pursue disciplinary action, specifically, Quick's testimony, Zahrey's early departure from work on that day, Zahrey's shaky alibi, and eye-witness testimony of Yanira Quinones. Boyce and Quick testified at the December 1999 due process hearing. See Pl.'s Ex. H. Quick admitted on cross-examination that he lied about certain aspects of Zahrey's involvement in the Guadalupe murder, but insisted he told the truth about the rest. Id. at 350, 455. The Police Department Assistant Trial Commissioner Robert Vinal recommended dismissal of the charges, noting in his decision that he considered Quick's and Maria Montanez's testimony regarding Zahrey's alleged criminal activities incredible and unpersuasive.[8] Commissioner Safir approved the dismissal on July 24. Def.'s Ex. 66 at 29. NYPD restored Zahrey to full duty, with weapon and shield, on September 24, 2000, and he received back pay. Def.'s Ex. 17 at 7. Zahrey requested to stay on at the automobile impound lot. Pl.'s Ex. D at ¶ 41.

---

[8] In his decision, Vinal noted Quick's limited credibility as a "long-time drug user," robber, and "'snitch' who has personally benefitted by receiving sentence reductions by providing information to police." Def.'s Ex. 66 at 24-25. Quick had admitted to "numerous lies...including that he told the parole board that he felt remorse for his crimes, that he once faked suicide while in prison in order to obtain better living arrangements, and that he has criminally impersonated his brother Ruben." Id. Vinal stated that "Quick was never completely forthcoming...about his own criminal activities and crimes that he was aware that others had committed calls into question the believability of anything he said about [Zahrey]." Id. In addition, "Quick had [] a strong motive to fabricate a story to inculpate [Zahrey] and he has offered so many different versions of these events that it [is] impossible to credit anything he says." Id. at 27. Finally, Vinal found Maria Montanez's testimony "unpersuasive" and "not directly probative." Id. at 29.

16

## IV. Zahrey's Current Lawsuit

In this action, Zahrey responds to Defendants' motion for summary judgment, first, by moving to strike Defendants' statement of material facts in support of their motion. See Fed. R. Civ. P. 56.1. Zahrey argues that Defendants' papers should be stricken because of specified procedural violations, e.g., Defendants' Rule 56.1 Statement includes paragraphs with multiple assertions and the motion for summary judgment does not cite to specific paragraphs of the Statement. Zahrey's claim, however, fails to recognize that Defendants have submitted a factually annotated version of their papers sufficient to satisfy the rules.

Zahrey further argues that the papers rely on inadmissible hearsay evidence and should therefore be stricken. Zahrey primarily objects to the proffered police reports as inadmissible hearsay evidence. However, the court rejects his arguments. First, the reports themselves are admissible as public records. Fed. R. Evid. 803(8)(B); see also Parsons v. Honeywell, Inc., 929 F.2d 901, 907 (2d Cir. 1991).[9] Moreover, the substance of the reports do not implicate multiple hearsay concerns, as Defendants

---

[9] Zahrey challenges that the reports were not "routine" police reports, but rather, records prepared for purposes of litigation. See Palmer v. Hoffman, 318 U.S. 109, 113-14 (1943). But Zahrey provides no case law to support his distinction between IAB reports and "routine" reports. All reports in some sense are prepared in anticipation of litigation, namely, the criminal trial; in this case, Zahrey relies upon unsubstantiated supposition to convince the court that the officers conspired to make misleading police reports and thus that the reports were written with the "ulterior motives" to bring criminal charges against Zahrey. Pl.'s Sur-reply Mem. 3. As is explained below, the court finds no evidence to support this assertion and finds the evidence admissible as public records.

17

use the reports to establish the existence of probable cause to prosecute and Defendants' states of mind during the investigation and prosecution. See Sheikh v. City of New York, No. 03-CV-6326 (NGG), 2008 WL 5146645, at *1 n.3 (E.D.N.Y. Dec. 5, 2008); Brewton v. City of New York, 550 F. Supp. 2d 355, 361 n.5 (E.D.N.Y. 2008); Drummond v. Castro, 522 F. Supp. 2d 667, 674 (S.D.N.Y. 2007); Richards v. City of New York, No. 97 Civ. 7990 (MBM), 2003 U.S. Dist. LEXIS 8037, at *20-21 (S.D.N.Y. May 6, 2003).

The case on which Zahrey principally relies, Griffin v. City of New York, 287 F. Supp. 2d 392 (S.D.N.Y. 2003), is inapposite. In Griffin, the police reports were offered to prove what happened at a crime scene, i.e., that police officers had probable cause to enter a residence when arriving at the crime scene. Id. at 397 (the reports were introduced to prove that police "told Shanequa upon arriving at the house . . . that she was under arrest, that Shanequa then fled back into the house, and that the officers therefore were justified in following her in order to make the arrest."). Thus, the reports were introduced to prove their truth. In the case at hand, in contrast, Defendants are introducing the police reports to show what information they had before them in deciding to prosecute, instead of what actually happened at the scenes the reports describe.

In any event, as Zahrey has the burden to demonstrate to the court that a genuine issue of material fact exists for trial, see

18

Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986), the court is relying primarily upon evidence introduced and referenced in Zahrey's Rule 56.1 Statement, to which Zahrey can have no admissibility complaints.  Zahrey's motions to strike are therefore DENIED and his objections are OVERRULED.

## **INDIVIDUAL DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AND OFFICIAL AND MUNICIPAL DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT**

Zahrey charges all Defendants with state malicious prosecution as well as constitutional equal protection violations pursuant to 42 U.S.C. §§ 1981 and 1985.  In addition, Zahrey sues Individual Defendants in particular under Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics, 403 U.S. 388 (1971) and 42 U.S.C. § 1983.[10]  Zahrey brings claims against Municipal Defendants for section 1983 violations pursuant to Monell v. Dep't of Soc. Servs., 436 U.S. 658 (1978), and state pendent claims against both Municipal and Official Defendants for negligent hiring, training, and supervision.

Defendants move for summary judgment on the grounds that:

(a) as a matter of law, specifically in regards to the criminal proceedings, Zahrey cannot establish a state or federal claim for malicious prosecution, cannot establish

---

[10] 42 U.S.C. § 1983 reads, in part: "Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subject, or causes to be subjected any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress. . . ."

19

any constitutional tort, and cannot overcome Defendants'
affirmative defenses of absolute immunity, qualified
immunity, and collateral estoppel;

(b)   as a matter of law, specifically in regards to the
departmental proceedings, Zahrey cannot establish a state
or federal claim and cannot overcome Defendants'
affirmative defense of qualified immunity;

(c)   as a matter of law, Zahrey cannot establish an equal
protection claim under 42 U.S.C. §§ 1981 and 1985; and

(d)   Zahrey has presented no evidence that Individual
Defendants Hawkins and Welsome were personally involved
in any of the challenged conduct.[11]

The court will analyze each of Defendants' grounds for summary
judgment in turn.   In accordance with Defendants' motions, the
court analyzes the criminal and departmental trials separately.

## I. Federal and State Malicious Prosecution Claims as Pertaining to Zahrey's Criminal Trial[12]

"While the tort of malicious prosecution protects against the
consequences of wrongful prosecution, public policy favors bringing
criminals to justice, and accusers must be allowed room for benign

---

[11] Municipal and Official Defendants have not moved for summary judgment
on Zahrey's claims for negligent training, supervision, or hiring, or his
section 1983 claims pursuant to Monell.

[12] Zahrey asserts claims for state malicious prosecution against
Individual Defendants as well as Official and Municipal Defendants based upon
the doctrine of respondeat superior.   Pursuant to Bivens, Zahrey's federal
section 1983 malicious prosecution claims are asserted only against Individual
Defendants.

20

misjudgments. The law therefore places a heavy burden on malicious prosecution plaintiffs." Smith-Hunter v. Harvey, 734 N.E.2d 750, 752 (N.Y. 2000); see also Rothstein v. Carriere, 373 F.3d 275, 282 (2d Cir. 2004). A malicious criminal prosecution claim under either 42 U.S.C. § 1983 or New York state law requires a showing of four elements: "1) the initiation or continuation of a criminal proceeding against plaintiff; 2) termination of the proceeding in plaintiff's favor; 3) lack of probable cause for commencing the proceeding; and 4) actual malice as a motivation for defendant's actions." Russell v. Smith, 68 F.3d 33, 36 (2d Cir. 1995); see also Ricciuti v. N.Y. City Transit Auth., 124 F.3d 123, 130 (2d Cir. 1997); Martinez v. City of Schenectady, 761 N.E.2d 560, 564 (N.Y. 2001).[13]

The thrust of Defendants' claim is that, after discovery, the record fails to make a sufficient showing of the first, third, and fourth elements of malicious prosecution, that is, that Zahrey cannot overcome the presumption of probable cause created by the grand jury indictment, and has not presented sufficient evidence of malice or that Defendants "initiated" the federal criminal

---

[13] In addition to the state law elements of malicious prosecution, "to sustain a § 1983 malicious prosecution claim, there must be a seizure or other 'perversion of proper legal procedures' implicating the claimant's personal liberty and privacy interests under the Fourth Amendment." Washington v. Rockland, 373 F.3d 310, 316 (2d Cir. 2004). Defendants do not challenge this requirement; plaintiff's arrest, other criminal detainment, and "requirements of attending criminal proceedings and obeying the conditions of bail suffice." Jocks v. Tavernier, 316 F.3d 128, 136 (2d Cir. 2003) (citing Murphy v. Lynn, 118 F.3d 938, 946 (2d Cir. 1997)); McLean v. City of Rome, No. 95-CV-1713 (RSP/DNH), 1998 U.S. Dist. LEXIS 8734, at *21-22 (N.D.N.Y June 8, 1998).

prosecution.

As explained below, the court finds that Zahrey has provided little if any evidence to support the vast majority of his claims of malice or bad faith on the part of Defendants, with the exception of Defendants' use of Sidney Quick. Accordingly, Defendants' motions are GRANTED in part and DENIED in part.

## A. Probable Cause

Probable cause is a "complete defense" to a cause of action for malicious prosecution. Savino v. City of New York, 331 F.3d 63, 72 (2d Cir. 2003). In malicious prosecution cases, probable cause constitutes "such facts and circumstances as would lead a reasonably prudent person to believe the plaintiff guilty." Boyd v. City of New York, 336 F.3d 72, 76 (2d Cir. 2003). If a grand jury returned an indictment for the charges made the subject of litigation, the court will presume the existence of probable cause. Savino, 331 F.3d at 72.[14] Here, because Zahrey was indicted by a

---

[14] The Second Circuit, in Russo, held in dicta that the presumption created by the indictment "is inapplicable . . . [where] the warrant is issued by a judge on the basis of the sworn accusations of the defendant in the malicious prosecution action." Russo v. New York, 672 F.2d 1014, 1018 (2d Cir. 1982). However, in Rothstein, the Court later qualified Russo. See Rothstein, 373 F.3d at 285 (Russo "did not involve a grand jury's indictment. Rather, the defendant there sought to ascribe presumptive effect to the issuance of an arrest warrant. We held, based on New York law, that the presumption is inapplicable where the warrant was issued based on the statements of the defendant in the malicious prosecution action. In this case, it cannot be said that the indictment was based on Carriere's testimony in the grand jury, let alone solely on that testimony. . . . Thus, Russo provides no reason to find the presumption inapplicable in this case." (citations omitted)). This case is like Rothstein, in that the grand jury proceeding obtaining the indictment and subsequent warrant did not rest solely on defendant police officer testimony. Rather, Sidney Quick, Lisa Rivera, and Maria Montanez made up a substantial part of the evidence introduced against Zahrey. Therefore, the court will follow Rothstein, rather than Russo, and the indictment presumption

federal grand jury, the burden of proof shifts to Zahrey to respond with specific evidence that, taken in the light most favorable to him, rebuts the presumption of probable cause for his arrest and prosecution. See id. A plaintiff can rebut this presumption by presenting evidence sufficient for a reasonable jury to find "that the indictment was procured by fraud, perjury, the suppression of evidence or other police conduct undertaken in bad faith." McClellan v. Smith, 439 F.3d 137, 145 (2d Cir. 2006) (quoting Colon v. City of New York, 455 N.E.2d 1248, 1251 (N.Y. 1983)); Savino 331 F.3d at 73. "The burden of rebutting the presumption of probable cause requires the plaintiff to establish what occurred in the grand jury, and to further establish that those circumstances warrant a finding of misconduct sufficient to erode the 'premise that the Grand Jury acts judicially.'" Rothstein, 373 F.3d at 284 (quoting Colon, 455 N.E.2d at 1250)). Zahrey must introduce "evidence establishing that the police witnesses have not made a complete and full statement of facts either to the Grand Jury or to the District Attorney, that they have misrepresented or falsified evidence, that they have withheld evidence or otherwise acted in bad faith." Colon, 455 N.E.2d at 1250-51.

In the alternative, the presumption "can be overcome by a showing by claimant that the conduct of the police deviated so

---

still applies. See Winn v. McQuillan, 403 F. Supp. 2d 292, 293 (S.D.N.Y. 2005).

23

egregiously from acceptable police activity as to demonstrate an intentional or reckless disregard for proper procedures." Hill v. Melvin, No. 05 Civ. 6645 (AJP), 2006 U.S. Dist. LEXIS 43006, at *54 (S.D.N.Y. June 27, 2006) (quoting Williams v. City of New York, No. 02 Civ. 3693 (CBM), 2003 U.S. Dist. LEXIS 19078, at *17-18 (S.D.N.Y. Oct. 23, 2003), aff'd, 120 F. App'x 388 (2d Cir. 2005)); see also Harris v. State, 756 N.Y.S.2d 302, 303 (N.Y. App. Div. 2003).

A plaintiff must provide concrete evidence to rebut the presumption, and may not rely on "mere 'conjecture' and 'surmise' that his indictment was procured as a result of conduct undertaken by the defendants in bad faith." Savino, 331 F.3d at 73 (quoting Bryant v. Maffucci, 923 F.2d 979, 982 (2d Cir. 1991)). "After a grand jury indictment, the case law for malicious prosecution sets a higher standard, which cannot be met by speculation or self-serving statements." Hill, 2006 U.S. Dist. LEXIS 43006, at *60.

Zahrey claims that Defendants acted in bad faith by coercing and inducing witnesses to obtain false testimony and withholding or concealing exculpatory evidence. Defendants contend that Zahrey has not satisfied his burden. If Zahrey's evidence were to suffice, Defendants argue, most other failed criminal investigations would result in malicious prosecution liability. See Gisondi v. Town of Harrison, 528 N.E.2d 157, 160 (N.Y. 1988).

24